*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

RAYMOND C. REYNOLDS,                    :
                                        :
        Plaintiff,                      :
                                        :                      OPINION
    v.                                  :        Civil Action No.: 08-2944 (FLW)
                                        :
                                        :
DEPARTMENT OF THE ARMY, et. al.         :
                                        :
                                        :
                                        :
        Defendant.                      :
_____:

**WOLFSON, United States District Judge**:

Presently before the Court is a motion for summary judgment by the Department of the

Army, and Dr. Frances J. Harvey, Secretary of the Army (the "Department of Army" or

"Defendants"), pursuant to Fed.R.Civ.P. 56, to dismiss the Complaint of Plaintiff Raymond C.

Reynolds ("Plaintiff" or "Reynolds").[1]  Plaintiff alleges that Norma Kornwebel ("Kornwebel"),

his direct supervisor, discriminated against him based upon his age and retirement eligible status

in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 (the

"ADEA"), which discrimination resulted in the forced election of early retirement.  Defendants

_____

[1]      The only remaining Counts of Reynolds' Complaint concern his claims brought under the
ADEA, as Plaintiff has previously stipulated to dismiss those Counts of his complaint alleging
claims under 42 U.S.C. §§ 1983, 1985, and 1988 (Count I), the New Jersey Law Against
Discrimination (Counts V and VI), Breach of Contract (Count VII), and Breach of Implied
Covenant of Good Faith and Fair Dealing (Count VIII).  Reynolds has also agreed to dismiss his
supervisor, Norma Kornwebel, and the John Does defendants from this action.  Additionally,
Plaintiff has withdrawn his request for a jury and claims for damages for pain and suffering,
emotional distress and punitive damages.

contend that they are entitled to summary judgment because Plaintiff suffered no adverse employment action and the circumstances under which he left his employment did not amount to constructive discharge.   Defendants also argue that Plaintiff cannot sustain his burden to establish a *prima facie* case of hostile work environment under the facts of this case.   Finally, Defendants contend that the Complaint fails to state a proper claim for retaliation under the ADEA and further, that no retaliation occurred, in that the only protected activity in which Plaintiff engaged occurred after the alleged discriminatory conduct.   For the reasons set forth below, the Court will grant Defendants' motion for summary judgment and dismiss the remaining ADEA counts (Counts II, III, IV and IX) in Plaintiff's Complaint.

## I.   BACKGROUND

At the time of Reynolds' early retirement in January 2005, he was fifty-one years old and had been employed by the federal government since 1978.  Compl. at ¶ 4.  Beginning in 1994, Reynolds began work with the Department of the Army.  Id. at ¶ 8.  In 2003, Reynolds was employed as a civilian employee for the Information Systems Engineering Command division ("ISEC") within the Department of the Army.  Defendants' Stmt. of Material Facts ("Defendants' Stmt.") at ¶ 1.  While still in his position at ISEC, Reynolds became eligible for the Voluntary Separation Incentive Program ("VSIP") and early retirement through the Voluntary Early Retirement Authority ("VERA"), programs that confer certain benefits to eligible federal employees who accept an early retirement and/or separation from federal service. In 2003, Reynolds received notice that his ISEC position was being reassigned to Fort Huachuca in Arizona.  Uncertain as to whether he would be offered the opportunity to transfer, Reynolds initially applied for VERA/VSIP at that time, though he apparently withdrew this application at an unspecified date.

Although Reynolds was offered a transfer to Fort Huachuca, he declined, opting to seek employment elsewhere within the federal government.  According to Reynolds, in January 2004, the personnel department discussed with him an opening in the U.S. Army Command Control, Communications, Computers, Intelligence, Surveillance and Reconnaisance ("C4ISR") On-The-Move Testbed (the "Testbed") section[2] of the Communications-Electronic Research Development Engineering Command ("CERDEC"), located in Forth Monmouth, New Jersey.  Compl. at ¶ 10.  Thereafter, in January 2004, Reynolds commenced his position at CERDEC as an Electronics Engineer, reporting to Kornwebel.  Defendants' Stmt. at ¶ 15.

Kornwebel, who is approximately six months older than Reynolds, has held numerous positions within the federal government since she began her career in 1974.  Id. at ¶ 9.  In 2002, during Reynolds' employment with the CERDEC, Kornwebel was the director/deputy director of the Testbed.  In that capacity, Kornwebel was responsible for the direct supervision of approximately 10-12 people[3] and approximately 25 government contractors.  Kornwebel claims that when she learned that Reynolds might be applying for the Electronics Engineer position with the Testbed, she attempted to contact him in late December 2003 or early January 2004 to speak with him regarding the necessary qualifications.  Id. at ¶ 14.  Reynolds disputes Kornwebel's assertion, claiming that prior to commencing the position at CERDEC he attempted to contact Kornwebel numerous times to inquire about the position, however, Kornwebel never returned his phone calls.  Plaintiff's Response at ¶ 15.  Kornwebel contends that in and around the latter half of January 2004 when Reynolds began work at the Testbed, she met with him to discuss his performance objectives.  Id. at ¶ 16; Kornwebel Dep. at T163:16 - T164:5.  Reynolds

---

[2]      The Testbed is a research and development command that integrates separate technologies into a comprehensive system, tests the system in a simulation experiment and documents the results of the experiment.  Id. at ¶ 10.

[3]      The number of people under Kornwebel's direct supervision increased dramatically during the summer testing period.

alleges that Kornwebel never met with him to discuss his job objectives when he began work in the Testbed in 2004. Reynolds' Jun. 29, 2009 Dep. at T41:12-23; Reynolds' Affidavit at ¶ 16.

The parties' versions of the events that ensued from the time Reynolds began work at the Testbed in January 2004, until his early retirement in January 2005, vary sharply. Defendants contend that at the time Reynolds began his position he did not know the technology, the Testbed or the integration of the systems. Defendants' Stmt. at ¶ 8. Recognizing that he would need time to adjust, Kornwebel advised Reynolds that Doug Wong was his team leader and assigned Wong to train and work with Reynolds so that Reynolds could familiarize himself with information about Command and Control within the Testbed and other information necessary to perform the mission of the Testbed. Id. at ¶ 24. Accordingly, Defendants contend, Reynolds' primary assignment during the first four to five months that he was in the Testbed was to learn the technology, the integration and the functions of the Testbed. Id. at ¶ 25. It is undisputed that, other than this training, Reynolds was given no real responsibilities in his first few months with the Testbed. Id. at ¶ 25.

In April, 2004, Reynolds was assigned to Fort Dix to coordinate tours for personnel going to the ranges at Fort Dix, and was in charge of the range scheduling for the Testbed. According to Defendants, his duties were to review the proposed experiments at the ranges and select the appropriate ranges to be requested. Id. at ¶ 34; Kornwebel Dep. at 31; Kornwebel Decl. at ¶ 13. Defendants contend that Reynolds did not take his duty of scheduling the ranges seriously as he would often attend morning coordination meetings without having contacted Fort Dix range control, resulting in a delay in starting the day's experiment. Id. at 40. According to Kornwebel, after Reynolds began working at Fort Dix, she received several complaints about him. Specifically, Kornwebel contends that Jim Bane ("Bane"), a mechanic at Fort Dix who

helped to coordinate with range control, complained several times that Reynolds would pass his duties off to others.  Kornwebel Decl. at ¶ 15.  For example, Kornwebel contends that in April 2004, Reynolds passed off his duty to prepare basic charts to Bane.  Id.  Additionally Kornwebel contends that Michele Carver, a computer scientist with the Testbed, also complained that Reynolds passed off his duties and that Kornwebel became aware that Reynolds was passing off his duties of coordinating range tours and scheduling ranges to others, like project/resource manager Annette Hunter.  Defendants' Stmt. at ¶¶ 49-50; Kornwebel Decl. at ¶ 15.  Kornwebel contends that she scheduled a meeting on May 6, 2004 to speak with Reynolds about his improper delegation of duties and to clarify his responsibilities.  Defendants' Stmt. at ¶ 52. Additionally, Kornwebel claims to have spoken with Reynolds again in June 2004 regarding not delegating his duties to others.  Id. at ¶ 53.   Kornwebel also sent an email to Reynolds in late May 2004, clarifying Reynold's duties and reminding him of his responsibilities.  Korwnwebel Decl., Ex. 3.  Further, Kornwebel contends she spoke with Reynolds in May or June 2004 about the fact that he was not progressing with respect to the Command and Control section of the Testbed.  Id. at ¶ 57.

In addition to Reynolds' passing work off to others, Kornwebel contends that she became aware that Reynolds was not following through in scheduling the ranges, bringing other engineers or contractors out to the ranges or complying with Kornwebel's directives.  Id. at ¶ 58; Kornwebel Dep. at 59-60.  Kornwebel states that she experienced firsthand Reynolds' failure to follow through with his assignments.  Id. at ¶ 58; Kornwebel Dep. at 46-47.  In the Spring of 2004, Kornwebel contends that Reynolds was detailed out to Fort Knox for a couple of weeks to provide support for an ongoing experiment and that during that assignment, he failed to follow through with a directive given by her.  Id. at ¶ 59.  Kornwebel contends that she spoke with

Reynolds regarding his failure to comply with instructions.  Id. at ¶ 60.  Further, according to Kornwebel, the most serious complaint received by the Testbed relating to Reynolds' deficiencies in his performance at Fort Dix, came from Harry Rochette, the Training Coordinator of the Combat Readiness Division at Fort Dix.  Rochette wrote a letter, dated August 13, 2004, complaining that Reynolds continually disregarded the training procedures and safety standards for the ranges at Fort Dix.  Id. at ¶ 61; Kornwebel Decl. at ¶¶ 16-17, Ex. 4.  Rochette noted two specific incidents in his letter, which he asserted placed personnel in grave danger.  In the first instance, Reynolds purportedly gave permission for two contractors to go onto a range without an escort, map or radio in violation of established procedures and the contractors ultimately found themselves on a range near a live fire exercise.  Defendants' Stmt. at ¶ 62; Kornwebel Decl. at ¶¶ 16-17.  In the second instance, Reynolds purportedly failed to schedule an area for a convoy test mission which failure violated safety procedures and placed personnel in danger.  Kornwebel Decl. at ¶ 17.  Kornwebel claims that because the use of ranges at Fort Dix by the Testbed was discretionary on the part of Fort Dix, she felt that she had no choice but to remove Reynolds from his position at Fort Dix to avoid the risk of being denied use of the ranges.  Id.  Thereafter, Kornwebel removed Reynolds from his position at Fort Dix and reassigned his duties to other personnel.  Id. at ¶ 66.

In August 2004, around the time that Reynolds was removed from his position at Fort Dix, Kornwebel conducted Reynolds' performance review.  Reynolds was given an acceptable evaluation in five of the seven objectives of his review.  Kornwebel Dep. at 43.  Reynolds was found to be deficient in Technical Support and Customer Satisfaction.  Korwebel Dep. at 42; Defendants' Stmt. at 70-74.  In or around October 2004, Reynolds filed an informal grievance, claiming that personnel should not have placed him in the GS-13 position with the Testbed, but

rather should have placed him in a position with higher grade and pay.  In connection with Reynolds' grievance, Kornwebel contends that she spoke with Regina Mozie-Allen from the personnel department, who advised her that in light of the deficiencies noted in Reynolds' performance evaluation, which resulted in the lowest rating of "five", Korwebel had to place Reynolds on a Performance Improvement Plan ("PIP") in order to help him come into compliance with his objectives.  Id. at ¶ 77; Kornwebel Decl. at ¶ 21.  Kornwebel contends that prior to speaking with Mozie-Allen, she had not considered placing Reynolds on PIP and did not know that his rating required placement on PIP.  Kornwebel Dep. at 100-101.

Kornwebel presented Reynolds with the PIP on November 3, 2004, which detailed the deficiencies in his performance and identified ways in which he should seek to improve performance to meet his objectives.  Kornwebel Decl. at ¶ 22; Kornwebel Dep. at 91-92, 108.  Mozie-Allen also sat in on the meeting and advised Reynolds that as a result of the PIP plan, Reynolds would lose his saved grade status and suffer a pay decrease effective immediately.  Plaintiff's Responding Stmt. at ¶ 79; Reynolds' Affidavit at ¶¶ 10-11.  Kornwebel contends that she met with Reynolds the next day, during which meeting Reynolds attempted to convince Kornwebel to remove the PIP by promising to retire in the spring of 2005.  Defendants' Stmt. at ¶ 80; Kornwebel Decl. at ¶ 23; Kornwebel Dep. at 111, 114-115.  Kornwebel contends that at that meeting and subsequent meetings, when Reynolds brought up early retirement, she advised that he may have that option, but that he did have other options as well, including improving his performance through the PIP.  Kornwebel Decl. at ¶ 23.  Kornwebel claims that she advised Reynolds that it was her preference that he work successfully completing the PIP.  Defendants' Stmt. at ¶ 81; Kornwebel Decl. at ¶23; Kornwebel Dep. at 185-186.

On November 4, 2004, Reynolds applied again for early retirement under the VERA/VSIP.  Id. at ¶ 82.  Kornwebel met with Reynolds shortly thereafter on December 3, 2004 to discuss the PIP.  Kornwebel contends that Reynolds had no suggestions as to what he wanted to work on and so she assigned him to learn and work in the field of operational architecture, providing him with a brief overview and directing him to work independently to gather information.  Kornwebel Decl. at ¶ 26.

On December 9, 2004, Reynolds contacted the EEOC office raising allegations of discrimination on the basis of age.  Defendants' Stmt. at ¶ 95; Plaintiff's Response at ¶ 95.  On December 14, 2004, Gary Martin ("Martin"), Acting Director of the CERDEC, sent Reynolds an email stating, in pertinent part,

> I was notified by the EEO Office that you have filed an EEO Complaint.  The notice of the complaint states that you allege that you were told by your supervisor that you should consider applying for early retirement . . . While I was advised that you applied for the VERA/VSIP, which I approved on or about 23 November, you are under no obligation to retire.  Retirement is purely voluntary so you may withdraw you application for VERA/VSIP at any time.

Id. at ¶ 98; Plaintiff's Response at ¶ 98.  On December 22, 2004, Reynolds met with Henry Muller, Acting Technical Director of the CERDEC, to discuss the PIP and his VERA/VSIP. Defendants contend that Muller agreed to extend the PIP for another 90 days due to Reynolds' concerns and have Reynolds' work assignment outlined to include additional metrics to be used in connection with the evaluation of his progress under the PIP.  Id. at ¶ 99.  Muller would not agree, however, to Reynolds' request to simultaneously extend the VERA/VSIP.  Id. at ¶ 100. Thereafter, on January 3, 2005, Reynolds exercised his early retirement option.  Id. at ¶ 105. Defendants contend that at no time prior to Reynolds' departure, did he receive a proposed removal letter or notice informing him that he would be downgraded in any way.  Id. at ¶ 106.

Defendants further assert that Kornwebel never told Reynolds that he would be fired if he didn't take the VERA/VSIP.  Id. at ¶ 107.

Reynolds' version of the events stands in stark contrast.[4]   Reynolds contends that Kornwebel made it abundantly clear that she never wanted to hire him.  Plaintiff's Stmt. at ¶ 6. In short, Reynolds claims that Kornwebel was upset that two men in their fifties were placed within her organization, rather than her two younger friends.  Id. at ¶ 8.  Reynolds contends that Kornwebel demonstrated animus towards him from the day she learned that he was coming to work in her department.  Id. at ¶ 9; Reynolds' Affidavit at ¶ 13.  He contends that she never spoke with him prior to his taking the job, nor did she return his phone calls.  Plaintiff's Responsive Stmt. at ¶ 15; Reynolds' Affidavit at ¶ 14.  Further, Reynolds contends that once he started the position, Kornwebel treated him in "a dismissive manner and would merely send him off to do reading rather than getting into a substantive discussion with him about the terms of the job he was expected to fulfill."  Reynolds' Affidavit at ¶ 15.  Reynolds contends that Kornwebel never provided a job description or position objectives.  Reynolds' Affidavit at ¶ 16.  Rather, Reynolds contends that Kornwebel would use Wong as an intermediary to give him assignments and suggests that she and Wong were "in cahoots" to get rid of him.  Id. at ¶ 18-19.

According to Reynolds, Kornwebel treated him differently than other employees in an attempt to embarrass, humiliate and force him to make mistakes and cause his termination .Id. at ¶ 20.  For instance, Reynolds contends that Kornwebel would have her secretary call him at 6:00 a.m. to ensure that he was at work.  Id. at ¶ 21. Reynolds contends that while every other person in his office was permitted to work overtime, without prior approval, Kornwebel refused to

---

[4]     As will be discussed more fully, infra, the bulk of Reynolds' Statement of Undisputed Material Facts and his Responding Statement, supportive of his version of events, is premised on the Affidavit of Linda Castellano, and his own Affidavit which mirrors that of Castellano, both of which have limited application given their numerous evidentiary infirmities.

approve his overtime.  Plaintiff's Stmt.  at ¶¶ 25-26.  Additionally, rather than orient him to his position, Kornwebel sent him off to do reading and provided no other input.  Plaintiff's Stmt. at ¶ 19.  Moreover, Reynolds claims that Kornwebel failed to provide him with a job description or position objectives, as she did for other younger employees.  Id. at ¶ 24.  Reynolds alleges that Kornwebel gave performance input to other employees, presumably in similar positions, who were younger than he.  Id. at ¶ 21.

Reynolds contends that Kornwebel fabricated the support for his failing performance appraisal.  Specifically, he contends that the letter from Rochette was not written in August 2004.  Rather, Reynolds asserts that it was Kornwebel that asked Rochette in August 2004 to draft the letter and to backdate same and that the letter was not actually received until as late as the Spring of 2005 when the litigation had commenced.  Plaintiff's Responsive Stmt. at ¶¶ 62-64.  Reynolds disputes Defendants' assertions that he voluntarily elected early retirement status.  Rather, Reynolds contends that Kornwebel's conduct in placing him on PIP two days prior to his election deadline, when combined with her failure to address the PIP or to provide objectives or metrics to be used in evaluating his progress, left him no choice but to retire. Reynolds Affidavit at ¶¶ 39-42.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."  Kaucher v. County of Bucks,

455 F.3d 418, 423 (3d Cir. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,

106 S.Ct. 2505, 91 L.Ed. 202 (1986).  Disputes over irrelevant or unnecessary facts will not

preclude a grant of summary judgment.  Anderson, 477 U.S. at 248.  "In considering a motion

for summary judgment, a district court may not make credibility determinations or engage in any

weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all

justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241,

247 (3d Cir. 2004) (quoting Anderson, 447 U.S. at 255); see also Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Curley v. Klem,

298 F.3d 271, 276-77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for

summary judgment.  Celotex, 477 U.S. at 330.  "A nonmoving party has created a genuine issue

of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."

Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).  The non-moving party must

present "more than a scintilla of evidence showing that there is a genuine issue for trial."

Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted).  Under

Anderson, Plaintiff's proffered evidence must be sufficient to meet the substantive evidentiary

standard the jury would have to use at trial.  477 U.S. at 255.  To do so, the non-moving party

must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." Celotex, 477 U.S. at 324 (quotations omitted); see also Matsushita, 475 U.S. at

586; Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).  In deciding the merits

of a party's motion for summary judgment, the court's role is not to evaluate the evidence and

decide the truth of the matter, but to determine whether there is a genuine issue for trial.

Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder.  Big
Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.        DISCUSSION

The only remaining Counts of Reynolds' Complaint (Counts II, III, IV and IX), upon
which Defendants now move for summary judgment, all involve Reynolds' claims of age
discrimination under the ADEA.  Defendants contend that Reynolds cannot establish that he
suffered disparate treatment under the ADEA because he cannot show that he suffered an
adverse employment action, nor can he demonstrate that he was constructively discharged as a
result of the alleged treatment he suffered.  Further, Defendants argue that Reynolds cannot
show a hostile work environment based on age discrimination because he cannot sustain his
burden to establish a *prima facie* case of age discrimination.  Defendants contend that even if
Reynolds were able to establish a *prima facie* case, he is unable to establish that Defendants'
legitimate, non-discriminatory reasons for its decisions were pretextual.  Moreover, Defendants
contend that Reynolds' ADEA retaliation claim fails because not only does he fail to allege the
elements of a retaliation claim in his Complaint, the only protected activity in which Plaintiff
engaged occurred after the alleged discriminatory conduct.

Reynolds argues that he has presented direct evidence in the form of an affidavit from
first-hand witness Linda Castellano, the former secretary of Kornwebel, which evidences direct
proof of age discrimination by Defendants.  Citing Castellano's affidavit and his own deposition
testimony and sworn statements, Reynolds contends that he has established a *prima facie* case of
age discrimination, and has set forth sufficient evidence to demonstrate that Defendants'
proffered reasons for placing him on the PIP program and, effectively, forcing him into early
retirement were pretextual.  Further, Plaintiff contends that there are genuine issues of material

fact regarding whether he was constructively discharged or whether he voluntarily elected early retirement.   As to his retaliation claim, Reynolds contends that even if the formal grievance he filed in October 2004 in connection with his pay grade status is not deemed a protected activity, he was nevertheless subjected to retaliation following his December 9, 2004 EEO Complaint. Reynolds reasons that the issuance of the PIP, which occurred in November 2004, one month prior to his EEO Complaint, does not form the basis for his retaliation, but, rather, he suffered "additional retaliation" following his EEO Complaint.  Specifically, Reynolds points to Kornwebel's refusal to meet with him to address issues regarding the PIP, and his assignment to Operational Architecture which was not addressed in the PIP.  Reynolds claims that Kornwebel prevented him from making progress and fulfilling the purported goals of the PIP.  Moreover, Reynolds argues that despite his expressed desire to remain employed with the federal government, he was denied the opportunity to secure another position.

### A.  Direct Evidence

Before the Court will consider the substance of Reynolds' age discrimination claims in the context of this motion, the Court is compelled to consider, and make certain rulings as to, evidence submitted by Reynolds in the form of Affidavits from Linda Castellano and Reynolds, himself.  Defendants contend that the conclusory statements set forth in those Affidavits have no basis in actual fact and may not be credited on the instant motion.  See Reply Br. at 4 (citing Hill v. Carpenter, 323 Fed. Appx. 167, 170 (3d Cir. 2009)).  Significantly, Fed.R.Civ.P. 56(e) requires that "[s]upporting or opposing affidavits [introduced at the summary judgment stage] . . . set forth such facts as would be admissible in evidence."  See also, Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d cir. 1993) (noting that evidence introduced at the summary judgment stage must be "capable of being admissible at

trial"). Accordingly, the Court has its own independent obligation to ensure that the evidence introduced by the parties satisfies the admissibility requirement of Rule 56(e). In this regard, the Court has undertaken a review of Reynolds' and Castellano's Affidavits and finds that, despite Reynolds' contention that they constitute direct evidence of age discrimination, they do not. Indeed, the Court finds the Affidavits deficient on multiple grounds under the applicable evidentiary standards.

Contrary to Reynolds' assertion, Castellano's Affidavit does not constitute direct evidence of Defendants' age discrimination. Direct evidence has been defined to mean "evidence sufficient to allow the jury to find that 'the decision makers placed substantial negative reliance on [the plaintiff's age] in reaching their decision' to fire him." Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002) (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting Price Waterhouse, 490 U.S. at 277)). "Such evidence 'leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it' when he made the challenged employment decision." Fakete, 308 F.3d at 338-39 (quoting Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1097 (3d Cir. 1995)). None of the statements in Castellano's Affidavit satisfy this standard.

The problem with Castellano's Affidavit, drafted by Reynolds' counsel in connection with Reynolds' case before the EEOC, is that it is largely incompetent. Fed.R.Civ.P. 56(e), makes clear that an "opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." L.Civ.R. 7.2(a) further provides that "[a]rgument of facts and the law shall not be contained in affidavits. Legal arguments and summations in affidavits will be disregarded by the Court and may subject the affiant to appropriate censure, sanctions or both." "L.Civ.R. 7.2

reflects the strongly-held position of the court that there should be a clear and inviolable line drawn between straightforward factual submissions on one hand and legal and factual argument more appropriately reserved for a brief on the other hand." See Allyn Z. Lite, *New Jersey Federal Practice Rules,* Comment 2 to L.Civ.R. 7.2 (2010 ed.).   Castellano's Affidavit fails in virtually all respects. The Court will note below only some examples.

Castellano was Kornwebel's secretary during the time period that Reynolds was employed in the Testbed.  Castellano therefore asserts that her position made her "aware of [Kornwebel's] activities correspondences and practices."  Castellano Affidavit at ¶ 34.  This Court does not question that Castellano's position as Kornwebel's secretary made her privy to information which may indeed be probative of Reynolds' claims in this litigation.  Permeating throughout the Affidavit, however, are conclusory statements by Castellano for which she offers no factual support or basis grounded in personal knowledge.  For example, Castellano states that "[e]very single person in the office was allowed to work overtime without prior approval, except Ray. The following individuals were allowed to work overtime without prior approval: Michelle Carver, who was in her late 30s, Yves Jean-Noel, who was in his mid 20s, Jason Sypnewski, who was in his mid-20s, Mike Amabile, who was in his mid-30s, Anthony Ferrara, who was in his late 30s, Bob Siliato, who was in his early 30s and Annette Hunter, who was in her late 30s." Castellano Affidavit at ¶ 69. Yet, other than her general statement that she was Kornwebel's secretary, Castellano fails to state the basis for her knowledge regarding employee overtime within the Testbed.  Moreover, the statement itself is indicative of someone who was not privy to such information by virtue of Castellano's failure to identify specific factual information pertaining to the actual number of employees within the Testbed and her reference to the ages of the employees by decades -- reflecting her perceived view of their ages, rather than her

knowledge of their actual ages.  Moreover, Castellano's Affidavit is replete with statements prefaced with language such as "to my knowledge", "I am not aware", "I believe", "I did not think", and "it was my impression".   These prefatory comments further reinforce the fact that many of Castellano's assertions are not rooted in her personal knowledge.

Additionally, the majority of the statements in Castellano's Affidavit seem more appropriately suited to a legal brief.   This is not surprising, since Castellano admits that Plaintiff's counsel drafted the Affidavit and that Castellano then adopted the statements as her own.  Id. at ¶ 2.  Castellano's Affidavit is filled with statements that amount to nothing more than legal argument.  For instance, Castellano states "there is no way an employee in this situation could even have a fighting chance to meet the objectives as he/she would not know of the objectives in advance." (Id. at ¶ 61); "To my knowledge, being placed on a PIP inevitably leads to termination.  In reality, placing an employee on a PIP is a step toward getting rid of them.  I do not know of anyone who was placed on PIP and was not later removed from their position." (Id. at ¶ 107); "Ms. Kornwebel waited until she started to prepare Ray's performance appraisal, to address the issue of his performance objectives.  At that time, she tasked Ray with writing his own objectives, over six months after she was required to have given  them to him." (Id. at ¶ 59). Clearly these states are violative of L.Civ.R. 7.2(a).

Further, many of Castellano's statements can be characterized as evincing not facts, but, rather her subjective view of the events.  Indeed, she states "Ms. Kornwebel's wanting to get rid of Ray had nothing to do with his work performance.  She was against Ray because she wanted a younger employee who was her friend in the position.  Ms. Kornwebel wanted two friends for two positions, and was really angered when she found out that Ray was coming to work there." Id. at ¶ 37.  Nowhere in the Affidavit does Castellano indicate how she came to know this

information, i.e., whether Kornwebel informed her of this directly or she overheard her speaking to someone else.  Nor does Castellano ever identify the names or ages of the two "younger" individuals that Kornwebel purportedly wanted to hire. Additionally, Castellano makes statements like Reynolds' age "was a problem for [Kornwebel]". See Castellano Affidavit at ¶ 39.  In the absence of deposition testimony from Castellano or additional documentary evidence supportive of Castellano's conclusory statements, much of what is set forth in the Castellano Affidavit is not sufficient to create a genuine issue of material fact for the purposes of this motion.

Reynolds' Affidavit suffers from the same infirmities.  Clearly there can be no dispute that the majority of Reynolds' statements are not based on personal knowledge as required by Rule 56(e) and L.Civ.R. 7.2(a) given Paragraph 2 wherein he asserts "I have spoken with Linda Castellano [].  I state below comments she has shared with me."  In light of the fact that Reynolds has essentially adopted Castellano's Affidavit, it is not surprising that he too asserts statements that amount to (i) legal argument (see, e.g. ¶ 3, ("I was constructively discharged under duress brought on by government action.")); (ii) his subjective views without any factual foundation (see, e.g. ¶ 9 ("Ms. Kornwebel purposely selected a time period to put me on a PIP when she knew I had a window to apply for retirement and further suggested that I avoid the PIP by applying for retirement)); and (iii) unsupported assertions made in the absence of personal knowledge (see, e.g. ¶ 3, ("Kornwebel, in conjunction with Human Resources, discussed my complaint; she admitted that Human Resources called her to discuss my complaint")).  "There is no rule of law that provides that a discrimination plaintiff may not testify in his or her own behalf, or that such testimony, standing alone, can never make out a case of discrimination that will survive a summary judgment motion." Jackson v. University of Pittsburgh, 826 F.2d 230,

236 (3d Cir. 1987).  However, where as here, the bulk of Reynolds' statements are based on information learned from third parties, are essentially Reynolds' subjective opinions, or amount to argument appropriately put in legal briefing, those statements will not be considered by this Court.

Although Defendants have refuted Reynolds' reliance on the Affidavits in opposition to this motion, Defendants have not moved to strike either Affidavit.  In the absence of argument from counsel, this Court has not culled through each statement in the Affidavit to determine its admissibility.  Rather, in analyzing the parties' substantive arguments, the Court will only consider those statements in the Affidavit that the Court finds do not suffer from the evidentiary deficiencies categorically described by the Court herein.

### B.  Disparate Treatment Claim (Count IV)

Section 633a of the ADEA, applicable here given Reynolds' status as a federal employee, provides, in pertinent part: "All personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a).  Accordingly, it is unlawful to discriminate against federal employees who are at least 40 years of age.  The Supreme Court has recently made clear that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action."  Gross v. FBL Fin. Servs., Inc., __ U.S. __, 129 S.Ct. 2343, 2352, 174 L.Ed.2d 119 (2009); see also Smith v. City of Allentown, 589 F.3d 684 (3d Cir. 2009).   The parties do not dispute the applicability of Gross's "but-for" causation requirement to Reynolds'

claims,[5] arguing instead over its meaning and application.   See Defendants' Reply Br. at 1-2;

Plaintiff's Sur-Reply Brief at 3.

Reynolds contends that Defendants have misconstrued Gross, arguing that

> while the opinion in Gross may use the word "*the*" before "but-for," it defines that standard as one in which age (or other protected trait) had "*a*" determinative influence on the outcome.   Accordingly, when the Gross Court stated "*the* but-for cause", it did not mean the "sole" or "single" cause, nor does the Gross Court ever use any language to reflect such a meaning.   Rather, a plaintiff may satisfy the required standard of proof by showing that the illegitimate factor was "a" determinative factor" in the adverse employment decision.

---

[5]     Nevertheless, the Court notes that the ADEA contains two distinct prohibition sections, one applicable to non-federal employers, 29 U.S.C. § 623(a), and one applicable to federal employers, § 633a(a).   Although it is not entirely clear from Plaintiff's Complaint which provision his ADEA cause of action arises under in that he cites "§ 621, *et al*.", generally, in support of his claims, presumably Plaintiff's claims arise under § 633a(a), as there is no dispute that he is a federal employee.   The ADEA provision at issue in Gross, however, dealt strictly with the non-federal employer provision which has markedly different statutory language.   In Gross, the Court rested its holding on the statutory language of § 623(a)(1), which reads: "It shall be unlawful for an employer . . . [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." (Emphasis Added).   The Supreme Court reasoned that shifting the burden of persuasion to an age discrimination defendant is contrary to the plain language of the statute, which requires the plaintiff to provide that the defendant took the adverse employment action "because of [the plaintiff's] age."   Gross, 129 S.Ct. at 2350-51; Smith, 589 F.3d at 690.   Following, Gross, some courts considering the issue of whether the "but for" standard applies to employees suing under the federal employer provision, 29 U.S.C. § 633a(a), have declined to apply Gross's "but-for" causation requirement to suits brought under the federal employer provision, reasoning that the language in § 633a(a) that actions be "free from any discrimination based on age" requires a different outcome than the non-federal employer provision at issue in Gross.   See, Fuller v. Gates, 2010 WL 774965, * 1 (E.D.Tex. Mar. 1, 2010) (noting that the use by Congress of different language in § 633a(a), that "[A]ll personnel actions . . . shall be made free from any discrimination based on age", "indicates that Congress intended the two sections to have different meanings" and compels the conclusion that the mixed motive analysis continues to apply in claims against the government.")   However, the parties here have both acknowledged that Gross applies and the majority of the district courts considering claims brought under the federal employer provision following Gross have likewise applied Gross's "but-for" causation requirement. See, e.g., Frankel v. Peake, 2009 WL 3417448, at * 4 (D.N.J. 2009), Shelley v. Geren, 2009 WL 3783159, at * 3-4 (E.D.Wash. 2009); Guerrero v. Preston, 2009 WL 2581568, at *3-5 (S.D.Tex. 2009); Glenn v. Bair, 643 F.Supp.2d 23, 28-29 (D.D.C. 2009); Wagner v. Geren, 2009 WL 2105680, at *4-5 (D.Neb. 2009).   Accordingly, this Court will do the same.

[Plaintiff's Opp. Br. at 6.]  As Defendants point out, however, Gross made clear that the burden of persuasion never shifts to an employer to demonstrate that it would have made the same decision if age had not been a factor.  Gross, 129 S.Ct. at 2349.  At all times, the burden of proof remains with the plaintiff.  Kelly v. Moser, Patterson and Sheridan, LLP, 348 Fed. Appx. 746, 749-50 (3d Cir. 2009).  In order to prove a violation of the ADEA, "it does not suffice to show that age played some minor role in the decision.  Gross, 129 S.Ct. at 2350.  The plaintiff must show that age was *the* 'but for' cause of the adverse employment action  - that age had 'a determinative influence on the outcome.'" Kelly, 348 Fed. Appx. at 749 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)) (emphasis added).  In Kelly, the Third Circuit noted that "[a]n act or omission is not regarded as a cause of an event if the particular event would have occurred without it."  Id. at 750 n.7.  Accordingly, there is no support for Plaintiff's position that age need only be "*a* 'but-for' cause" rather than "*the* 'but-for' cause".  The case law makes clear that "[a] plaintiff must establish that age 'actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome.'" Deville v. Givaudan Fragrances Corp., No. 08-2034 (GEB), 2010 WL 2232718,  * 3 (D.N.J. Jun. 1, 2010) (quoting Gross, 129 S.Ct. at 2350).  Thus, a plaintiff cannot prove his claim under the ADEA where age is "a secondary consideration" in the employment decision, but not "a determinative 'but for' factor."  Kelly, 348 Fed. Appx. at 751.

As discussed, supra, the Affidavits proffered by Reynolds in opposition to the motion do not qualify as "direct evidence".  Accordingly, in the absence of any direct evidence, this Court will review the sufficiency of Reynolds' claim under the McDonnell Douglas framework. The Court notes here that the deficiencies in the Affidavits of Castellano and Reynolds present significant hurdles for Reynolds in demonstrating evidence of a *prima facie* case under the

20

McDonnell Douglas analysis as well.  To survive summary judgment on his disparate treatment claim, Reynolds must satisfy his burdens under the McDonnell Douglass framework.[6]   As recently explained by the Third Circuit in Smith, the McDonnell Douglas burden shifting approach works as follows:

> the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a *prima facie* case of discrimination . . . . .  Once the plaintiff satisfies these these elements, the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action.   If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination.   At all times, however, the burden of persuasion rests with plaintiff.

[Smith, 589 F.3d at 689-90. (Emphasis Added).]

To establish a *prima facie* case of discrimination in an ADEA case, a plaintiff must show "first that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus."  Smith, 589 F.3d at 689-90.  Here, Defendants contest only the second and fourth elements of Reynolds' *prima facie* case, conceding for purposes of this Motion that Defendant is a member of the protected class and that he was qualified for the position within the CERDEC.  See Defendants' Br. at 8.

---

[6]        In Gross, the Supreme Court observed that it had "not definitively decided whether the evidentiary framework of McDonnell Douglas . . . is appropriate in the ADEA context."  Gross, 129 S.Ct. at 2349, n.2 (citations omitted).  Following the decision in Gross, the Third Circuit considered whether the Supreme Court's holding in Gross disturbed the application of the McDonnell Douglas framework in age discrimination cases and determined that Gross did not forbid continued adherence to precedent applying the McDonnell Douglas framework to age discrimination cases.  Smith, 589 F.3d at 691.  Additionally, the Court notes that Reynolds does not object to application of the McDonnell Douglas framework to his claims.

In connection with the second element, Defendants argue that Reynolds has failed to establish that he suffered an adverse employment action under the ADEA.  Defendants contend that federal precedent does not support Reynolds' allegation that placement on PIP constituted an adverse employment action.  See Defendants' Moving Br. at 9, Reply Br. at 10 (citing Cole v. Illinois, 562 F.3d 812, 817 (7th Cir. 2009); Haynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1224 (10th Cir. 2006); Givens v. Cingular Wireless, 396 F.3d 998 (8th Cir. 2005)). Defendants argue that there is simply no legal support for Castellano's conclusory statement that "placing an employee on a PIP is a step towards getting rid of them."  Defendants' Reply Br. at 10 (citing Castellano Aff. at ¶ 107).

Reynolds argues that it was not the PIP alone that supports his assertion of an adverse employment action.  Rather, Reynolds contends that "[t]he placement, timing and framing of the PIP are steps viewed together, along with the totality of the circumstances and other ageist actions, which reflect an intent to 'get rid of Ray' and compelled him to retire or face certain termination."  Plaintiff's Opp. Br. at 26.   In sum, Reynolds relies on the PIP, his assertion that he was subjected to a hostile work environment, and his assertion that he was constructively discharged to support his claim that he suffered an adverse employment action.  Id. at 26-31.  As discussed more fully infra, however, in the context of Reynolds' hostile work environment and constructive discharge claims, Reynolds has failed to satisfy his burden as to those claims on the instant motion.  Accordingly, in evaluating whether Reynolds has satisfied his burden of demonstrating an adverse employment action for the purposes of his *prima facie* case on this motion, the Court here will focus on his placement on the PIP.

Reynolds' placement on the PIP, absent more, simply cannot support a finding that Reynolds was subjected to an adverse employment action.  As Reynolds recognizes, an adverse

employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998). As Defendants point out, a PIP alone cannot constitute an adverse employment action absent changes to pay, benefits or employment status. See Haynes v. Level 3 Communications, LLC, 456 F.3d at 1224 (holding that while a PIP, standing alone, is not an adverse employment action, a written warning may indeed constitute an adverse employment action where "it effects a significant change in the plaintiff's employment status."); Cole v. Illinois, 562 F.3d at 817 (finding that an improvement plan cannot constitute adverse employment action, where the most onerous aspect required only submission of daily and weekly schedules, but did not deprive employee of responsibility, hours or pay); Givens v. Cingular Wireless, 396 F.3d at 998-99 (noting that placement on employee improvement plan is actionable only if later used to detrimentally alter terms and conditions of plaintiff's employment).

Here, Reynolds has provided no factual support in the record that could support a finding that he actually suffered any change in his employment status as a result of the PIP or his reassignment from Fort Dix. Reynolds asserts in his Responding Statement of Facts that he was informed by Human Resources Specialist Regina Mozie Allen during the November 3, 2004 meeting that "because of the PIP plan Plaintiff would lose his saved grade status and suffer a pay decrease effective immediately, about $20,000 per year." See Plaintiff's Responding Stmt. at ¶ 79; see also Plaintiff's Stmt. at ¶ 107. However, other than general assertions by Reynolds that Mozie Allen told him that this *would* occur, there is no support in the record for a finding that Reynolds' pay was ever actually reduced or that he received a downgrade in status. Indeed, in his Affidavit, Reynolds simply asserts that Mozie Allen advised him that he "*was getting* the pay

decrease."  (Emphasis added) Reynolds' Affidavit at ¶ 102.  Moreover, when deposed, Reynolds stated only that "Mozie-Allen presented me with a document that said I was going to have a reduction in pay because I could not be in the same pay status under a PIP.  So that *was going* to cost me about 15,000 a year."  Reynolds' Feb. 8, 2007 Dep at T142:21 - T143:1. (Emphasis added). Conspicuously absent in the record is any affirmative statement from Reynolds, either through deposition testimony or affidavit, that he ever actually suffered the downgrade or pay decrease.  Reynolds' statements in his Affidavit and deposition testimony that he "would suffer" a downgrade are insufficient to create a genuine issue of material fact.

Moreover, while not specifically argued by Reynolds, his transfer from Fort Dix following Kornwebel's performance allegations likewise does not support a finding that he was subjected to an adverse employment action.  "Minor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions." Langley v. Merck & Co., Inc., 186 Fed. Appx. 258, 260-61 (3d Cir. 2006) (citing Flaherty v. Gas Research Inst., 31 F.3d 451, 456 (7th Cir. 1994) (holding that changes to title and reporting relationships are insufficient to constitute an adverse employment action under the ADEA where plaintiff retained same grade level, benefits and level of responsibility.)).  Other than Reynolds' general assertions that his new assignment to Operational Architecture was undesirable in that it was not within his expertise and he was not being given proper training or guidance within that position, there is no assertion that Reynolds' assignment at Fort Dix was objectively considered to be a better job.  See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 71 (holding that "reassignment of job duities is not automatically actionable" absent a finding that the new position is "objectively considered a better job.").  See also Bacone v. Philadelphia Housing Authority, 112 Fed. Appx. 127, 129 (3d Cir. 2004)

(evaluating whether reassignment qualified as an adverse employment action "[b]ased on objective factors like hours, pay, benefits, and seniority").   Accepting Reynolds' factual allegations and reasonable inferences drawn therefrom as true, the Court simply cannot find that Reynolds has set forth a cognizable adverse employment action.

Turning to the fourth and final <u>McDonnell Douglas</u> element, Defendants argue that Reynolds has failed to set forth a *prima facie* case of disparate treatment in that he has failed to establish that he was replaced by a younger person.   Reynolds contends that a genuine issue of material fact exists as to whether he was replaced, which precludes summary judgment. Plaintiff's Opp.   Br. at 23.   Reynolds points to Kornwebel's deposition testimony wherein Kornwebel testified that following Reynolds' removal from his position at Fort Dix, his duties were taken over by Jim Bane and Doug Wong.   <u>See</u> Dec. 18, 2006 Kornwebel Dep. at T69:19 - T70:6.   Additionally, Reynolds cites Castellano's Affidavit wherein she states that Reynolds was replaced in his position at Fort Dix by Jim Bane, whom, Castellano states "[u]pon information and belief . . . is younger than Ray."   Castellano Affidavit at ¶¶ 119-120.

In response, Defendants argue that Reynolds' reliance on statements that he was replaced in his position by Bane or Wong are misplaced because

> neither Bane nor Wong were hired after Reynolds left Fort Dix to fill his position.   Wong was already employed by the CERDEC when Reynolds left Fort Dix and worked with Reynolds.   Similarly, Bane was employed by the U.S. Army in his capacity as a mechanic and was not subsequently hired by the CERDEC to take over Reynold's [sic] position.   Both Bane and Wong merely took on extra duties to fill the void left by Reynolds at Fort Dix; neither took Reynolds' job.   Moveover, Reynolds continued to work for several months after leaving Fort Dix, and there is no evidence proffered by Plaintiff to suggest that either Bane or Wong took over any of Reynolds' other duties.

Assuming, *arguendo,* that Reynolds has set forth sufficient evidence to support his assertion that he was "replaced" in his position by Bane and Wong, and assuming that substitution by those two existing employees is sufficient under the case law to constitute "replacement" for the purposes of the fourth element of <u>McDonnell Douglas</u>, Reynolds cannot satisfy this element in that he fails to point to any competent evidence in the record that could support a finding that Wong and Bane were sufficiently younger than he.  In support of this element, Reynolds points to Castellano's Affidavit.  However, with regard to Bane, Castellano states only that "[u]pon information and belief Jim Bane is younger than Ray."  Castellano Affidavit at ¶¶ 119-120. With respect to Wong, Castellano states only that Wong "was in his mid-40's."  <u>Id.</u> at 53.

Clearly, Castellano's unsupported assertions regarding the approximate ages of Wong and Bane are insufficient to satisfy the fourth element of <u>McDonnell Douglas</u>.  At the time of his alleged replacement by Wong and Bane, Reynolds was 52.  Statements that Wong was "in his mid-40's" and that Bane was "younger than Ray" simply do not constitute competent evidence in the record supportive of a finding that Reynolds was indeed replaced by sufficiently younger employees.  Moreover, as discussed <u>supra</u>, references to statements in Castellano's Affidavit in support of the instant motion where those statements run afoul of Rule 56(e)'s proscriptions is improper.   <u>See</u> <u>Fowler v. Borough of Westville</u>, 97 F.Supp.2d 602, 607 (D.N.J. 2000) ("[S]tatements prefaced by the phrases, 'I believe' or 'upon information and belief' . . . are properly subject to a motion to strike.").

Alternatively, Reynolds argues that to satisfy the fourth element of his *prima facie* case under *McDonnell Douglas*, he "is merely required to present facts that if unexplained, reasonably give rise to an inference of discrimination."  Plaintiff's Opp. Br. at 31 (citing <u>Terry v.</u>

26

<u>Ashcroft</u>, 336 F.3d 128, 137-38 (2nd Cir. 2003)).   Plaintiff incorrectly states what is required to establish his *prima facie* case of age discrimination in this Circuit.   It is true that the Third Circuit has incorporated an "inference of discrimination" as part of the fourth element of the *prima facie* case in age discrimination cases.   <u>See</u> <u>Smith</u>, 589 F.3d at 689-90 (stating the fourth prong as requiring a showing "that the plaintiff was ultimately replaced by another employee who was sufficiently younger *to support an inference of discriminatory animus*.") (emphasis added).   Importantly, however, as the language in <u>Smith</u> makes clear, in order to reach the inference, an ADEA plaintiff must first establish that he was replaced by a sufficiently younger worker.   Reynolds' contention that he has satisfied the fourth element of his *prima facie* case by demonstrating an inference of discrimination based on the overall facts of the case, rather than by reference to whether he was replaced by a sufficiently younger worker, misconstrues what is required under case law in this Circuit.   Here Plaintiff does not reach the inference, as he fails to produce any competent evidence supportive of his claim that Bane and Wong were sufficiently younger.

In sum, Reynolds has failed to set forth a *prima facie* case of age discrimination under the ADEA.   He as not demonstrated that he suffered an adverse employment action that was causally related to his membership in a protected class.   Likewise, Reynolds has failed to demonstrate that he was replaced by a sufficiently younger worker or to otherwise raise an inference of discrimination.   As Reynolds has failed to substantiate a *prima facie* case of age discrimination under the ADEA, the Court need not address the second and third prongs of the <u>McDonnell Douglas</u> framework.   Summary Judgment is granted as to Reynolds' disparate treatment claim (Count IV).

### C.  Hostile Work Environment (Count II)

Assuming such claim is even cognizable under the ADEA,[7] the Court now turns to Reynolds' hostile work environment claim.  To establish a *prima facie* case of hostile work environment under the ADEA, a plaintiff must prove that "(1) he suffered intentional discrimination, (2) that was severe and pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would have a similar effect on a reasonable person of the same protected class in that position, and (5) the existence of *respondeat superior* liability."  Reyes v. Autozone, Inc., No. 08-847, 2009 WL 4559454 * 11 (W.D.Pa. Dec. 2, 2009) (citing Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).

Reynolds has failed to establish the existence of a sufficiently severe and pervasive abusive work environment.  To determine whether comments are sufficiently severe or pervasive, courts "evaluate 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance."  Whitesell v. Dobson Communication, 353 Fed.Appx. 715, 717 (3d Cir. 2009) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).  Here, as in Whitesell, where comments were neither physically threatening nor humiliating and Reynolds has failed to demonstrate how the comments affected his work performance, Reynolds cannot demonstrate his *prima facie* case.  See Whitesell, 353 Fed.Appx. at 717.

First, the Court notes that Reynolds' assertion that Kornwebel's harassment was "constant" premised on his assertion that "she consistently avoided meeting with him, speaking with him or giving him direction", belies reason.  Additionally, while there is scant support in the record for Reynolds' assertion that Kornwebel expressed animus toward him on the basis of

---

[7]     The Third Circuit has not yet formally recognized a cause of action for hostile work environment under the ADEA, but has assumed as much.  See Whitesell v. Dobson Communication, 353 Fed.Appx. 715, 717 (3d Cir. 2009).

age, as discussed <u>supra</u> in the context of the disparate treatment claim, Reynolds has failed to assert that Kornwebel made comments that were physically threatening or humiliating or affected his work performance.  Indeed, Reynolds' only allegations pertaining to derogatory statements made to him by Kornwebel are set forth in his Affidavit as follows: "Kornwebel told me on at least three (3) occasions that she never wanted me: (1) once in July 2004 when she also told me that she wanted to hire Bane into the range job, but was forced to hire Ken (who subsequently passed away, leaving a vacancy) off the stopper list instead; (2) on November 9, 2004, the day she told me to apply for VSIP/VERA, and said the whole thing was Tracy Annania's fault and that Tracy Anania did it because 'she was a *** idiot'"; (3) when she told me about the Operational Architecture work and who she wanted to hire instead."  Clearly those statements do not rise to the level necessary to constitute severe or pervasive conduct under the ADEA, particularly where they contain no connection to Reynolds' age.  Indeed, the only comments suggestive of animus by Kornwebel that have been identified by Reynolds were reported by Castellano, not Reynolds. Nor does Reynolds state that any of Kornwebel's comments remotely related to his age were reported to him by Castellano or anyone else prior to his retirement.

Additionally, Reynolds' assertions that Kornwebel kept constant tabs on him, refused to approve his overtime, would not deal directly with him, and essentially caused him to lose interaction with his peers who would not socialize with him because they wanted to stay on Kornwebel's good side, cannot create a genuine issue of material fact where there is no competent evidence supporting the inference that the conduct was based upon Reynolds' age. Further probative of the lack of evidence to support Reynolds' assertions that his work environment was sufficiently severe and pervasive to support his claim, is his admission that had

the deadline for his election of the VERA/VSIP been extended to correspond with the PIP extension offered by Defendants, that he would have stayed in his position in the Testbed under Kornwebel.  Reynolds' Feb. 16, 2006 Dep. at T67:10-19; T77:8 - T79:7.   Reynolds has simply failed to meet his burden of establishing a *prima facie* case of hostile work environment under the ADEA.  Summary Judgement is, therefore, granted in favor of Defendants as to Count II.

### D. Constructive Discharge (Count IX)

Courts in this Circuit employ an "objective test to determine whether an employee can recover on a claim of constructive discharge." Duffy v. Paper Magic, Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001); see also Colwell v. Rite Aid Corp., 602 F.3d 495, 502 (3d Cir. 2010). Specifically, a court must determine "whether a reasonable [factfinder] could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." Id.  "The law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." Clowes v. Allegheny valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993).  "The constructive discharge standard envisions working conditions that are 'outrageous, coercive and unconscionable' and requires conduct more egregious than necessary to satisfy a hostile work environment claim." Swingle v. Novo Nordisk, Inc., No. 08-1186 (JAP), 2009 WL 2778106, * 5 (D.N.J. 2009) (quoting Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 28, 803 A.2d 611 (2002) and considering a constructive discharge claim based on retaliation under the Family Medical Leave Act).

Factors to be considered in a constructive discharge case, known as the "Clowes factors", include: "(1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations." Stremple v. Nicholson, 289

Fed. Appx. 571, 574 n.1 (3d Cir. 2008) (quoting Suders v. Easton, 325 F.3d 432, 445 (3d Cir.

2003), vacated on other grounds, Penn. State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 159

L.Ed.2d 204 (2004)).      Although the factors enumerated in Clowes are neither absolute nor

comprehensive, the Third Circuit and other district courts have affirmed summary judgment in

instances where a plaintiff has failed to demonstrate one or more of those factors.  See, e.g.,

Clegg v. Falcon Plastics, Inc., et al., 174 Fed. Appx. 18, 27 (3d Cir. 2006); Duffy, 265 F.3d at

168; Ferguson v. Deptford Twp., 2008 U.S. Dist. LEXIS 105144, at *18-19 (D.N.J. Dec. 22,

2008); Vanartsdalen v. Twp. of Evesham, 2007 U.S. Dist. LEXIS 55859, at *11-16  (D.N.J. Aug.

2, 2007).

　　　"The constructive discharge standard envisions working conditions that are 'outrageous,

coercive and unconscionable' and requires conduct more egregious than necessary to satisfy a

hostile work environment claim.'"    Swingle v. Novo Nordisck, 2009 WL 2778106, * 5 (quoting

Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 28 (2002)).  Setting aside the fact that

Reynolds has not set forth conduct sufficient to satisfy his hostile work environment claim, the

problem with Reynolds' constructive discharge claim is even more fundamental than his failure

to allege facts supportive of the Clowes factors.  Reynolds openly admitted that had the deadline

for his election of the VERA/VSIP been extended to correspond with the PIP extension offered

to Reynolds by Henry Muller, Acting Technical Director of the CERDEC, he would have stayed

in his position in the Testbed under Kornwebel.  Reynolds' Feb. 16, 2006 Dep. at T67:10-19;

T77:8 - T79:7    While he claims that it was "the harassing and discriminatory actions of

Defendant and Kornwebel that compelled [his] election of benefits under the VERA/VSIP", (see

Reynolds' Affidavit at ¶ 4), Reynolds admitted that it was his concern that the PIP would result

in his termination that motivated his election of early retirement, despite Muller's offer to extend

the PIP for an additional 90 days and further outline his work assignment to include additional metrics to be used in evaluating his progress under the PIP.  Reynolds reasons that Kornwebel intentionally waited until November 3, 2004 to place him on the PIP, despite the fact that she had made the decision to do so in August 2004, in an effort to place him under "extreme time pressure and duress" so that he would be compelled to apply for early retirement.  Reynolds' Affidavit at ¶ 46.  Reynolds contends Kornwebel's "animus towards [him] is what forced [him] to apply for retirement when it was clear that [he] would be terminated if [he] did not retire."  Id. at ¶ 50. While Reynolds argues that "[u]nder the PIP the only option was [his] termination as Kornwebel would not meet with [him] so that [he] could make no progress towards completing the PIP", (Reynolds' Affidavit at ¶ 105), his argument is undermined by Muller's offer to extend the PIP and address Reynolds' concerns regarding the lack of any metrics in the PIP to be used in evaluating his progress.   While there may indeed be situations in which such an offer to remedy a plaintiff's concerns comes too little too late such that a fact finder could conclude that a reasonable individual in the plaintiff's position nevertheless had no choice but to resign, the facts do not support such a finding here.  On the record before this Court on the instant motion, this Court simply cannot find that a reasonable person would have felt compelled to resign. Accordingly, Reynolds' claim based on his alleged constructive discharge (Count IX) cannot withstand summary judgment.

### E. Retaliatory Termination (Count III)

In Gomez-Perez v. Potter, 553 U.S. 474, 128 S.Ct. 1931 (2008), the Supreme Court held that a plaintiff may indeed bring an age discrimination claim under the federal sector provision of the ADEA.  Stremple v. Nicholson, 289 Fed.Appx. at 573.  As with disparate treatment claims alleging age discrimination under the ADEA, retaliation claims brought under the ADEA are analyzed under the three-step McDonnell Douglas framework.  Rosetsky v. National Board of

Medical Examiners, 350 Fed. Appx. 698, 701 (3d Cir. 2009).  To establish a *prima facie* case of

retaliation, an ADEA plaintiff "must present sufficient evidence to establish that: (1) she was

engaged in protected conduct; (2) an adverse action was taken; and (3) there is a causal link

between the protected conduct and the adverse action."  Id.  (citing Woodson v. Scott Paper Co.,

109 F.3d 913, 920 n.2 (3d Cir. 1997)).  Once the plaintiff establishes the *prima facie* case, the

burden shifts to the employer "to present a non-retaliatory explanation for the challenged

employment decision."  Id.

It is undisputed that Reynolds was placed on the PIP and applied for early retirement

more than a month before he contacted the EEO office to complain of age discrimination.  Prior

to his December 9, 2004 pre-complaint interview with the EEO, Reynolds made no formal

complaints of employment discrimination based upon age.  While Reynolds did file a grievance

with the EEO in October 2004, that grievance concerned issues related to his pay grade and,

contrary to Reynolds' assertions, cannot therefore constitute protected activity under the ADEA.

Reynolds argues that even if his October 2004 grievance is not deemed protected activity,

he has nevertheless established a *prima facie* case because he was subjected to adverse

employment action following his December 9, 2004 complaint which included "Kornwebel's

refusal to meet with [him] to address the issues in the PIP and explain the PIP, which prevented

him from making any progress against it and/or fulfilling its purported goals."  Plaintiff's Sur-

Reply at 1.  Additionally, Reynolds asserts that his assignment to Operational Architecture,

which was not even mentioned in the PIP, and Defendants' failure to assist him in securing

another position, also amount to adverse action following his December 9, 2004 EOC complaint.

Not only is this not adverse employment action, but even assuming *arguendo* that the post

December 9, 2004 conduct identified by Reynolds could constitute adverse action, Reynolds has

utterly failed to identify any causal link between the filing of the complaint and the allegedly

adverse action.  Accordingly, the Court finds that Reynolds has failed to meet is burden of establishing a *prima facie* case of retaliation under the ADEA and grants summary judgment in favor of Defendants as to Count III.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.


Dated: June 30, 2010

   s/ Freda L. Wolfson
FREDA L. WOLFSON, U.S.D.J.
